IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-741

 Filed: 6 October 2020

Cabarrus County, Nos. 17 CRS 50307-08

STATE OF NORTH CAROLINA

 v.

RAFAEL ALFREDO PABON, Defendant.

 Appeal by defendant from judgments entered 14 December 2018 by Judge

Christopher W. Bragg in Cabarrus County Superior Court. Heard in the Court of

Appeals 12 May 2020.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Ryan
 Frank Haigh, for the State.

 Currin & Currin, by George B. Currin, for defendant-appellant.

 BERGER, Judge.

 On December 14, 2018, a Cabarrus County jury found Rafael Alfredo Pabon

(“Defendant”) guilty of first-degree kidnapping and second-degree forcible rape.

Defendant appeals, arguing that (1) the trial court erred when it denied his motions

to dismiss; (2) the trial court erred when it admitted 404(b) evidence; (3) the trial

court erred when it admitted expert testimony; (4) the indictments were facially

invalid; (5) the trial court committed plain error when it failed to properly instruct

the jury; (6) the trial court erred when it allowed the jury to consider evidence of
 STATE V. PABON

 Opinion of the Court

aggravating factors; and (7) the trial court erred when it ordered Defendant to enroll

in satellite-based monitoring (“SBM”). We disagree.

 Factual and Procedural Background

 In November 2015, Defendant met Samantha Ivethe Camejo-Forero (“the

victim”) to discuss a roof repair warranty. The victim and Defendant subsequently

developed a friendship, and she would ask Defendant for assistance with her home

repair business.

 On January 4, 2017, Defendant drove to the victim’s house to take her to

breakfast. At 8:36 a.m., the victim left her house in Defendant’s vehicle. Defendant

handed her a latte to drink. The victim drank the latte and began “feeling weird.”

Throughout the car ride, the victim “couldn’t think[, and] couldn’t move.”

 At 9:42 a.m., Defendant and the victim arrived at a Denny’s restaurant for

breakfast. The restaurant was 42 miles away from the victim’s house. Defendant

and the victim sat on the same side of the booth, which the victim stated was

abnormal. The victim “couldn’t even read” the menu and had no recollection of what

she ordered or whether she ate. She testified that she was not “in control of [her]

body,” and at one point, the victim appeared to be asleep at the table.

 At 10:28 a.m., Defendant and the victim left the Denny’s restaurant and drove

to get the mail for Defendant’s friend. After driving for 16 miles, they arrived at

Defendant’s friend’s house at 11:04 a.m. While at the house, the victim testified that

 -2-
 STATE V. PABON

 Opinion of the Court

she was sitting on a couch when Defendant began kissing and touching her, including

kissing her breast. The victim did not want to be kissed or touched by Defendant.

Defendant then took the victim to a bedroom where he laid her on the bed. Defendant

said, “You don’t know how bad I want this,” and took off the victim’s clothes.

Defendant then engaged in nonconsensual vaginal intercourse with the victim. Soon

after, the victim went to the bathroom and saw a used condom.

 At 12:48 p.m., Defendant and the victim started the drive back to the victim’s

house. Around 12:49 p.m., the victim talked with her mother on the phone but could

not remember the conversation. Her mother testified that the victim was “speaking

in a very slurred kind of way.” The victim recalled that while in the car, Defendant

acted “like nothing had happened.”

 At 1:34 p.m., the victim arrived home. Before the victim went inside,

Defendant said, “Give me a kiss.” The victim, appearing to her mother to be “very

pale . . . like a zombie or a dead person,” then went into her mother’s room, without

speaking, and fell asleep.

 Around 5:00 p.m. that afternoon, the victim awoke. She felt “weird,” “couldn’t

walk straight,” and “knew what happen[ed].” At 5:23 p.m., the victim texted

Defendant the following:

 Hi Rafa. I would like to ask you what happened at Denny’s.
 Did I finish my breakfast? I told that you I didn’t feel well,
 I feel weird, and I almost couldn’t walk real good. I came

 -3-
 STATE V. PABON

 Opinion of the Court

 home and I just pass out until now, and I still feel in me
 weird. What happen?

 At 5:28 p.m., Defendant called the victim. Defendant told the victim that

nothing had happened. According to her, Defendant said, “We just pick[ed] up the

mail, you wait[ed] for me in the car, and -- I took you back home.” Defendant told the

victim that they were at his friend’s house for “five minutes, no more than that.” Once

the parties hung up, the victim fell back asleep until the next morning.

 On January 5, the victim again called Defendant because she was “still feeling

weird, . . . like it was a dream[.]” The victim then contacted the Matthews Police

Department and was directed to take a rape test at a hospital. The victim left for the

hospital “dressed the exact same way that she was [the] night before.” The victim

told medical professionals and law enforcement officers what she remembered about

the incident.

 On January 6, 2017, the victim gave a formal statement to detectives. She

granted detectives access to her phone, her location data, and subsequently provided

a hair sample. On January 23, 2017, Defendant was indicted on charges of second-

degree forcible rape and first-degree kidnapping.

 At trial, Frank Lewallen, a forensic scientist at the North Carolina State Crime

Laboratory, testified that he reviewed the procedures and the results of the victim’s

blood and urine samples. Lewallen testified that the initial urine test was positive

for Amphetamine, Methylenedioxyamphetamine, and Benzodiazepine. The State

 -4-
 STATE V. PABON

 Opinion of the Court

Crime Lab then conducted confirmatory testing of the urine samples using gas

chromatography mass spectrometry (“GCMS”). The victim’s urine tested positive for

a 7-aminoclonazepam, “a breakdown product of Clonazepam[,] which is a

Benzodiazepine.” Lewallen confirmed that Clonazepam is a “central nervous

depressant” with side effects of “feeling like they were in a dream . . . [and] a loss of

inhibition or loss of anxiety.”

 Dr. Ernest Lykissa, a clinical and forensic toxicologist, testified that he tested

the victim’s hair sample, which represented hair growth from December 22, 2016 to

January 19, 2017. After testing the hair sample with a liquid chromatograph mass

spectrometer, Dr. Lykissa determined the victim’s hair contained Cyclobenzaprine –

a muscle relaxant. Cyclobenzaprine “floods the brain with serotonin,” the

neurotransmitter that causes sleep, but in excess, can “numb [a person] to death.”

Dr. Lykissa also confirmed the State Crime Lab’s conclusion that Clonazepam was in

the victim’s urine. Like Cyclobenzaprine, Clonazepam has numbing effects that

“make [a person] very sleepy.” The effect of taking Cyclobenzaprine and Clonazepam

together results in a “[v]ery serious impairment of [a person’s] mental and physical

faculties.” If a person were to take these two drugs with caffeine, they “can’t see well,

. . . can’t hear well, . . . and [they’re] very close to [their] demise.” Dr. Lykissa

concluded that the victim’s symptoms were consistent with someone who recently

took Cyclobenzaprine, Clonazepam, and caffeine.

 -5-
 STATE V. PABON

 Opinion of the Court

 Lucy Montminy, a sexual assault nurse examiner, testified to treating the

victim at Novant Health on January 5, 2017. During in-take, the victim identified

Defendant as her assailant. Montminy testified that the victim’s mannerisms were

consistent with an individual who was “under the influence of impairing substances.”

The victim was prescribed various antibiotics to treat any potential sexually

transmitted disease. None of these medications contained Cyclobenzaprine or

Clonazepam. Other than these prescribed medications, the victim “was not taking

any medications.” Montminy testified that during her examination of the victim, she

discovered an “injury to [the victim’s] vaginal area” that was “consistent with

penetration.” Montminy’s observations were consistent with drug related rape.

 Kari Norquist, a forensic scientist, testified that she conducted DNA analysis

on the victim’s rape test samples, which included swabs of the victim’s left breast.

Norquist determined there were substantial amounts of Defendant’s DNA on the

victim’s left breast sample, and that the amount of Defendant’s DNA on the victim’s

left breast was not common with a casual transfer of DNA.

 Outside the presence of the jury, the trial court conducted a voir dire hearing

related to 404(b) evidence from Chanel Samonds and Elise Weyersburg. The trial

court determined that their testimony was admissible, and provided a limiting

instruction to the jury.

 -6-
 STATE V. PABON

 Opinion of the Court

 Samonds, Defendant’s sister-in-law, testified that Defendant came to her

house on the morning of September 8, 2008. After Samonds asked Defendant to leave,

he stood up, “tried to kiss [Samonds’] neck” and “pushed [her] back down on the

couch[, a]nd pinned [her] hands above [her] head so that he could start kissing [her].”

Despite Samonds’ objections and refusal, Defendant attempted to kiss her mouth.

Defendant then removed Samonds’ pants and digitally penetrated her vagina. With

Samonds “half on the couch and half off the couch,” Defendant then engaged in

nonconsensual vaginal intercourse with Samonds.

 Weyersberg, Defendant’s other sister-in-law, testified that around 2006 when

she was 19 or 20 years old, she was living with her parents along with Defendant and

his wife. During this time, Weyersberg “felt uncomfortable with” Defendant. On one

occasion, Weyersberg was in the kitchen when Defendant came behind her and

rubbed her shoulders while moving his hands towards her breasts. At the same time,

Defendant told her “how he had an orgy in Bolivia” while she continued to move away

from him because she felt “very uncomfortable.” Weyersberg did not tell her parents

about the incident. On a separate occasion, Weyersberg was on the computer when

Defendant approached her and asked if she wanted a massage. At the same time,

Defendant was “trying to put his hand up the bottom of [her] pant leg.” Weyersberg

then left the room and later told her parents about the incident.

 -7-
 STATE V. PABON

 Opinion of the Court

 Defendant testified at trial that he picked the victim up for breakfast on

January 4, went to the Denny’s restaurant, and then stopped at his friend’s house.

Defendant testified that he and the victim engaged in sexual and physical activity at

his friend’s house.

 A Cabarrus County jury found Defendant guilty of second-degree forcible rape

and first-degree kidnapping. The jury also found as an aggravating factor that

Defendant took advantage of a position of trust or confidence for each charge.

Defendant was sentenced to consecutive terms of 104 to 137 months and 104 to 185

months in prison.

 Defendant appeals, arguing that (1) the trial court erred when it denied his

motions to dismiss; (2) the trial court erred when it admitted 404(b) evidence; (3) the

trial court erred when it admitted expert testimony; (4) the indictments were facially

invalid; (5) the trial court committed plain error when it failed to properly instruct

the jury; (6) the trial court erred when it allowed the jury to consider evidence of

aggravating factors; and (7) the trial court erred when it ordered Defendant to enroll

in SBM. We disagree.

 Analysis

I. Motion to Dismiss

 Defendant contends the trial court erred when it denied his motion to dismiss

the charge of first-degree kidnapping and the aggravating factors based on

 -8-
 STATE V. PABON

 Opinion of the Court

insufficient evidence.1 Defendant also asserts that the trial court erred when it

denied his motion to dismiss on double jeopardy grounds. We disagree.

 “This Court reviews the trial court’s denial of a motion to dismiss de novo.”

State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). “If

there is more than a scintilla of competent evidence to support the allegations in the

warrant or indictment, it is the court’s duty to submit the case to the jury.” State v.

Horner, 248 N.C. 342, 344-45, 103 S.E.2d 694, 696 (1958). “The terms ‘more than a

scintilla of evidence’ and ‘substantial evidence’ are in reality the same and simply

mean that the evidence must be existing and real, not just seeming or imaginary.”

State v. Earnhardt, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (citation omitted).

“Substantial evidence is that amount of relevant evidence necessary to persuade a

rational juror to accept a conclusion.” State v. Scott, 356 N.C. 591, 597, 573 S.E.2d

866, 869 (2002) (citation omitted). “In ruling on a motion to dismiss for insufficient

evidence, the trial court must consider the evidence in the light most favorable to the

State, which is entitled to every reasonable inference which can be drawn from that

evidence.” State v. Dick, 126 N.C. App. 312, 317, 485 S.E.2d 88, 91 (1997) (citation

omitted).

A. First-Degree Kidnapping

 1 Defendant states in his brief that he “moved to dismiss all charges against him” on the
grounds of insufficient evidence. However, Defendant does not argue in his brief that there was
insufficient evidence of the second-degree forcible rape charge. Thus, Defendant has abandoned this
argument. N.C. R. App. P. 28(b)(6).

 -9-
 STATE V. PABON

 Opinion of the Court

 First-degree and second-degree kidnapping offenses are set forth in N.C. Gen.

Stat. § 14-39. The relevant portions of that Section state:

 (a) Any person who shall unlawfully confine, restrain,
 or remove from one place to another, any other person 16
 years of age or over without the consent of such person,
 . . . shall be guilty of kidnapping if such confinement,
 restraint or removal is for the purpose of:

 ...

 (2) Facilitating the commission of any felony or
 facilitating flight of any person following the
 commission of a felony[.] . . .

 (b) There shall be two degrees of kidnapping as defined
 by subsection (a). If the person kidnapped . . . [was] sexually
 assaulted, the offense is kidnapping in the first degree and
 is punishable as a Class C felony. If the person kidnapped
 was released in a safe place by the defendant and had not
 been seriously injured or sexually assaulted, the offense is
 kidnapping in the second degree and is punishable as a
 Class E felony.

N.C. Gen. Stat. § 14-39 (2019) (emphasis added).

 Defendant argues that because there was evidence of only one sexual assault,

he could not be convicted of, and sentenced for, first-degree kidnapping. Defendant

correctly asserts that when the sexual assault and the felony that is the object of the

kidnapping are the same, “a defendant may be convicted of first degree kidnapping

and the underlying sexual offense which raised it to first degree, although the

defendant cannot be punished for both.” See State v. Freeland, 316 N.C. 13, 23-24,

340 S.E.2d 35, 40-41 (1986). The proper remedy in the event of a conviction for first-

 - 10 -
 STATE V. PABON

 Opinion of the Court

degree kidnapping and the sexual assault that constitutes an element of the first-

degree kidnapping charge is to arrest judgment on the first-degree kidnapping charge

and resentence defendant for second-degree kidnapping. See State v. Mason, 315 N.C.

724, 737, 340 S.E.2d 430, 439 (1986).

 Here, however, the State’s evidence tended to show Defendant committed at

least two sexual assaults against the victim. The State satisfied the sexual assault

element of first-degree kidnapping with evidence of a separate and distinct sexual

battery. This occurred when Defendant kissed the victim’s breasts on the couch. The

subsequent second-degree rape was not used to satisfy the sexual assault element of

first-degree kidnapping. As such, both the first-degree kidnapping and second-degree

forcible rape are properly charged and sentenced.

 A defendant may be convicted of second-degree forcible rape if the State proves

the Defendant engaged in vaginal intercourse

 (1) By force and against the will of the other person; or
 (2) Who has a mental disability or who is mentally
 incapacitated or physically helpless, and the person
 performing the act knows or should reasonably know the
 other person has a mental disability or is mentally
 incapacitated or physically helpless.

N.C. Gen. Stat. § 14-27.22(a)(1-2) (2019).

 A person is guilty of sexual battery if the person

 for the purpose of sexual arousal, sexual gratification, or
 sexual abuse, engages in sexual contact with another
 person:

 - 11 -
 STATE V. PABON

 Opinion of the Court

 (1) By force and against the will of the other
 person; or
 (2) Who has a mental disability or who is
 mentally incapacitated or physically helpless, and
 the person performing the act knows or should
 reasonably know that the other person has a mental
 disability or is mentally incapacitated or physically
 helpless.

N.C. Gen. Stat. § 14-27.33(a)(1-2) (2019) (emphasis added). “[T]he element of acting

for the purpose of sexual arousal, sexual gratification, or sexual abuse may be

inferred from the very act itself.” In re: S.A.A., 251 N.C. App. 131, 135, 795 S.E.2d

602, 605 (2016) (purgandum). Sexual contact includes “[t]ouching the sexual organ,

anus, breast, groin, or buttocks of any person.” N.C. Gen. Stat. § 14-27.20(5)(a)

(2019).

 The jury could infer from Defendant’s actions that he acted “for the purpose of

sexual arousal, sexual gratification, or sexual abuse,” In re: S.A.A., 251 N.C. App. at

135, 795 S.E.2d at 605, when he touched and kissed the victim’s breasts. See State v.

Schultz, 88 N.C. App. 197, 201, 362 S.E.2d 853, 856 (1987) (finding circumstantial

evidence of intent where “the victim testified that defendant dragged her down a

hallway toward a guest bedroom, and that he put his hand down over her shoulder

and down the front of her shirt and grabbed her breasts.”). Therefore, there was

sufficient evidence from which the jury could determine that Defendant committed a

sexual battery.

 - 12 -
 STATE V. PABON

 Opinion of the Court

 The fourth element of first-degree kidnapping requires that Defendant

committed a sexual assault separate and distinct from the second-degree forcible

rape. If the jury determines that Defendant committed both offenses, the charges

will be determined to be separate and distinct since sexual battery is not an element

of second-degree forcible rape. The trial court gave the following jury charge for first-

degree kidnapping:

 The defendant has been charged with first degree
 kidnapping. For you to find the defendant guilty of this
 offense, the State must prove five things beyond a
 reasonable doubt. First, that the defendant unlawfully
 restrained a person; that is, restricted her freedom of
 movement and/or removed her from one place to another;

 Second, that the person did not consent;

 Third, that the defendant restrained and/or removed that
 person for the purpose of facilitating defendant’s
 commission of second degree forcible rape. Second degree
 forcible rape, as I earlier instructed you, is when a
 defendant engages in vaginal intercourse with the alleged
 victim and at that time the alleged victim was so
 substantially incapable of resisting an act of vaginal
 intercourse as to be mentally incapacitated and/or so
 physically unavailable to resist an act of vaginal
 intercourse as to be physically helpless and that the
 defendant knew or should reasonably have known that the
 alleged victim was mentally incapacitated and/or
 physically helpless;

 Fourth, that this restraint and/or removal was a separate,
 complete act independent of and apart from the second
 degree forcible rape;

 And, fifth, that the person had been sexually assaulted.

 - 13 -
 STATE V. PABON

 Opinion of the Court

 In this case, the State is alleging that the sexual assault
 committed by the defendant is sexual battery. To prove
 sexual battery, the State must prove three things beyond a
 reasonable doubt. First, that the defendant engaged in
 sexual contact with another person. Sexual contact means
 touching the breast of any person;

 Second, that the alleged victim was mentally incapacitated
 and/or physically helpless and the defendant knew or
 should reasonably have known that the alleged victim was
 mentally incapacitated and/or physically helpless;

 And, third, that the defendant acted for the purpose of
 sexual gratification.

 If you find from the evidence beyond a reasonable doubt
 that on or about the alleged date the defendant unlawfully
 restrained a person and/or removed a person from one
 place to another and that the person did not consent, and
 that this was done for the purpose of facilitating the
 defendant’s commission of second degree forcible rape, and
 that this restraint and/or removal was a separate, complete
 act independent of and apart from the second degree forcible
 rape, and that the person restrained and/or removed had
 been sexually assaulted, it would be your duty to return a
 verdict of guilty of first degree kidnapping. If you do not so
 find or have a reasonable doubt as to one or more of these
 things, you would not return a verdict of guilty of first
 degree kidnapping.

(Emphasis added).

 For a criminal defendant to be “charged and convicted of two separate counts

of assault stemming from one transaction, the evidence must establish a distinct

interruption in the original assault followed by a second assault, so that the

subsequent assault may be deemed separate and distinct from the first.” State v.

 - 14 -
 STATE V. PABON

 Opinion of the Court

Littlejohn, 158 N.C. App. 628, 635, 582 S.E.2d 301, 307 (2003) (purgandum). Further,

this Court has previously held that “rape is not a continuing offense.” State v. Owen,

133 N.C. App. 543, 552, 516 S.E.2d 159, 165 (1999) (purgandum).

 At trial, Defendant admitted that he touched the victim on the couch. Further,

the State’s evidence tended to show that Defendant touched and kissed the victim’s

breasts while she was on the couch. After the first sexual battery occurred, there was

a distinct and intentional interruption in the incidents when Defendant removed the

victim from the couch to the bedroom where he then committed second-degree forcible

rape.

 Because the State presented substantial evidence of sexual battery, which was

the underlying sexual assault for the first-degree kidnapping charge, the trial court

did not err when it denied Defendant’s motion to dismiss. In addition, the trial court’s

instructions to the jury correctly state the law for the jury to consider.

 Defendant similarly argues that his convictions and sentences for first-degree

kidnapping and second-degree forcible rape violated the prohibition against double

jeopardy. Defendant’s argument is without merit.

 The general rule is that the double jeopardy clause
 of the Federal Constitution protects an individual from
 being subjected to the hazards of trial and possible
 conviction more than once for an alleged offense. . . . If the
 legislature has specifically authorized cumulative
 punishment for the same conduct under two statutes the
 prosecutor may seek and the trial court or jury may impose
 cumulative punishment under such statutes in a single

 - 15 -
 STATE V. PABON

 Opinion of the Court

 trial. If cumulative punishment is not so authorized, a
 defendant may only be punished under one statute.

Freeland, 316 N.C. at 21, 340 S.E.2d at 39 (citations and quotation marks omitted).

“[T]he legislature did not intend that defendants be punished for both the first degree

kidnapping and the underlying sexual assault.” Id. at 23, 340 S.E.2d at 40-41.

“Therefore, it is a double jeopardy violation to convict and sentence a defendant for

both first degree kidnapping and the sexual offense that constituted the sexual

assault element of the first degree kidnapping charge.” State v. Barksdale, 237 N.C.

App. 464, 473, 768 S.E.2d 126, 132 (2014) (citation omitted).

 Defendant was convicted for first-degree kidnapping and second-degree

forcible rape. However, Defendant was not convicted of sexual battery, the

underlying sexual assault for first-degree kidnapping. This is distinguishable from

Barksdale where the defendant was convicted of both first-degree kidnapping and the

underlying sexual assault. Id. at 474, 768 S.E.2d at 132. Thus, Defendant’s

conviction for first-degree kidnapping did not violate his double jeopardy protections.

Moreover, the State presented sufficient evidence of two separate sexual acts –

second-degree forcible rape and sexual battery. Therefore, Defendant was properly

convicted of second-degree forcible rape and first-degree kidnapping where sexual

battery was the underlying sexual assault, not the second-degree forcible rape.

 The trial court properly instructed the jury that in order to find Defendant

guilty of first-degree kidnapping, they had to find that the victim’s “restraint and/or

 - 16 -
 STATE V. PABON

 Opinion of the Court

removal was a separate, complete act independent of and apart from the intended

second degree forcible rape” and that the victim “had been sexually assaulted,” which

the State alleged was a “sexual battery.” The trial court then instructed the jury as

to the elements of sexual battery. Finally, the trial court instructed the jury,

 If you do not find the defendant guilty of first degree
 kidnapping, you must determine whether the defendant is
 guilty of second degree kidnapping. Second degree
 kidnapping differs from first degree kidnapping only in
 that it is unnecessary for the State to prove that the person
 had been sexually assaulted.

 Moreover, the verdict sheet specifically required the jury to find Defendant

committed a sexual battery before finding Defendant guilty of first-degree

kidnapping. The verdict sheet for first-degree kidnapping specifically stated:

 We, the jury, as to the charge of First Degree Kidnapping
 (supported by a unanimous finding that the defendant
 committed a sexual battery), unanimously find the
 Defendant, Rafael Alfredo Pabon, to be:

(Emphasis added).

 For the reasons stated herein, and because the trial court limited the jury’s

consideration of the sexual assault element of first-degree kidnapping to sexual

battery, we conclude that Defendant’s constitutional protection of double jeopardy

was not violated.

B. Aggravating Factors

 Defendant argues that the trial court erred when it denied his motion to

dismiss the aggravating factors for insufficiency of the evidence. We disagree.

 - 17 -
 STATE V. PABON

 Opinion of the Court

 The only aggravating factor the trial court submitted to the jury was whether

“[t]he defendant took advantage of a position of trust or confidence, including a

domestic relationship, to commit the offense.” N.C. Gen. Stat. § 15A-1340.16(d)(15)

(2019). “A finding of this aggravating factor depends on the existence of a relationship

between the defendant and victim generally conducive to reliance of one upon the

other.” State v. Helms, 373 N.C. 41, 44, 832 S.E.2d 897, 899 (2019) (citation and

quotation marks omitted). “We have upheld a finding of the ‘trust or confidence’

factor in very limited factual circumstances.” Id. at 44, 832 S.E.2d at 899 (citation

omitted). See also State v. Potts, 65 N.C. App. 101, 105, 308 S.E.2d 754, 757 (1983)

(finding sufficient evidence of a “position of trust” where the victim was considered

one of defendant’s “best friends”).

 Here, the State’s evidence tended to show that Defendant and the victim were

friends. The victim had pictures of Defendant and his family on her phone.

Defendant gave Christmas presents to the victim’s family. The victim asked

Defendant to check on her mother while the victim was out of the country. Defendant

testified that they frequently had personal conversations over coffee. The two would

go shopping, see movies, and eat meals together. The victim sought out and relied on

Defendant’s advice for her home renovation business, and Defendant helped her

improve her business.

 - 18 -
 STATE V. PABON

 Opinion of the Court

 Thus, the State presented substantial evidence that Defendant and the victim

had a relationship in which the victim relied upon Defendant, that he maintained a

position of trust with the victim, and he took advantage of that position to kidnap and

rape the victim.

II. Rule 404(b)

 Defendant next argues that the trial court erred when it admitted the 404(b)

evidence of prior sexual assaults against Samonds and Weyersberg. We disagree.

 When the trial court has made findings of fact and
 conclusions of law to support its 404(b) ruling . . . we look
 to whether the evidence supports the findings and whether
 the findings support the conclusions. We review de novo
 the legal conclusion that the evidence is, or is not, within
 the coverage of Rule 404(b). We then review the trial court’s
 Rule 403 determination for abuse of discretion.

State v. Beckelheimer, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

 Under Rule 404(b) of the North Carolina Rules of Evidence,

 Evidence of other crimes, wrongs, or acts is not admissible
 to prove the character of a person in order to show that he
 acted in conformity therewith. It may, however, be
 admissible for other purposes, such as proof of motive,
 opportunity, intent, preparation, plan, knowledge,
 identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2019).

 Rule 404(b) is “a clear general rule of inclusion of relevant evidence of other

crimes, wrongs or acts by a defendant.” State v. Coffey, 326 N.C. 268, 278-79, 389

S.E.2d 48, 54 (1990). “[S]uch evidence is admissible as long as it is relevant to any

 - 19 -
 STATE V. PABON

 Opinion of the Court

fact or issue other than the defendant’s propensity to commit the crime.” State v.

White, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53 (1995) (citation omitted).

 Admission of 404(b) evidence “is constrained by the requirements of similarity

and temporal proximity.” State v. Al-Bayyinah, 356 N.C. 150, 154, 567 S.E.2d 120,

123 (2002) (citations omitted). “Evidence of a prior bad act generally is admissible

under Rule 404(b) if it constitutes substantial evidence tending to support a

reasonable finding by the jury that the defendant committed the similar act.” Id. at

155, 567 S.E.2d at 123 (citation and quotation marks omitted) (emphasis in original).

 Prior bad acts are sufficiently similar “if there are some unusual facts present

in both crimes” that “would indicate that the same person committed both.” State v.

Stager, 329 N.C. 278, 304, 406 S.E.2d 876, 890-91 (1991) (citations and quotation

marks omitted). However, “[w]e do not require that the similarities rise to the level

of the unique and bizarre.” Beckelheimer, 366 N.C. at 131, 726 S.E.2d at 159 (citation

and quotation marks omitted). “[T]his Court has been markedly liberal in admitting

evidence of similar sex offenses by a defendant for the purposes [outlined] in Rule

404(b).” State v. Bagley, 321 N.C. 201, 207, 362 S.E.2d 244, 247 (1987) (citation and

quotation marks omitted).

 Here, the trial court found the testimony of Samonds and Weyersberg

admissible as evidence of a common plan or scheme under Rule 404(b). The trial

 - 20 -
 STATE V. PABON

 Opinion of the Court

court concluded that the evidence was sufficiently similar and satisfied the Rule 403

balancing test.

 The trial court found sufficient similarities between the prior bad acts and the

crime at issue in this case, highlighting that “[t]he acts between Ms. Samonds and

[the victim were] rape . . . the criminal act is as identical as you can get. But . . . the

act with Ms. Weyersberg was a sexual – at least a sexual battery in that matter with

an intent to go further which did not occur.” We agree with the trial court.

 First, each woman testified that Defendant gained their trust prior to each

incident. Samonds “never felt threatened” by Defendant, and she specifically testified

that on the day of her assault, she “didn’t really think anything about” Defendant

coming over or that “he’s lying to [her] just to come over.” Weyersberg trusted

Defendant because her parents allowed him to live with her sister in their family

house, where she also lived. Likewise, the victim testified that she trusted Defendant

because she had a mentorship-like relationship with him and also spent a significant

amount of time with Defendant.

 Second, Defendant utilized that position of trust to sexually assault each

woman. Samonds testified that she sat next to Defendant on the couch where he then

began to kiss her and eventually rape her. Weyersberg testified that Defendant

massaged her shoulders to then touch her breasts and that he put his hand up her

pant leg while asking if she wanted to use “massage oils with him.” The victim

 - 21 -
 STATE V. PABON

 Opinion of the Court

testified that she drank a coffee that Defendant gave her and immediately began

feeling “feeling weird” before he sexually assaulted her.

 Finally, in each situation, Defendant tried to persuade each victim that he had

not sexually assaulted them. Therefore, the trial court did not err in finding the

testimony was sufficiently similar because the evidence tended to show that in each

circumstance the victim trusted Defendant and Defendant then abused this position

of trust to assault each woman.

 There is no bright line rule regarding temporal proximity for the purposes of

Rule 404(b) testimony. See State v. Maready, 362 N.C. 614, 624-25, 669 S.E.2d 564,

570 (2008). Our courts have previously held 27 years was not too remote to satisfy

this requirement. See State v. Register, 206 N.C. App 629, 637-39, 698 S.E.2d 464,

470-71 (2010). Here, the trial court found that the “temporal proximity [requirement

was] met” despite the 10-year and 8-year attenuation, considering the “common

scheme and plan or intent” of the Defendant. We agree. Our Supreme Court has

held that “[w]hen similar acts have been performed continuously over a period of

years, the passage of time serves to prove, rather than disprove, the existence of a

plan” rendering the prior bad acts “not too remote to be considered as evidence of

defendant’s common scheme to abuse the victim sexually.” State v. Shamsid-Deen,

324 N.C. 437, 445, 379 S.E.2d 842, 847 (1989) (emphasis added) (citation omitted).

 - 22 -
 STATE V. PABON

 Opinion of the Court

Because these acts were performed continuously over a period of years, the acts were

not too remote to be considered for the purposes of 404(b).

 Finally, the trial court must consider the evidence in the context of Rule 403.

Rule 403 provides that “[a]lthough relevant, evidence may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice[.]” N.C. Gen.

Stat. § 8C-1, Rule 403 (2019). This determination is left to the sound discretion of the

trial court. See Beckelheimer, 366 N.C. at 130, 726 S.E.2d at 159.

 “A trial court abuses its discretion if its determination is manifestly

unsupported by reason and is so arbitrary that it could not have been the result of a

reasoned decision. We determine whether a trial court abused its discretion by

looking at the totality of the circumstances.” State v. Ross, 207 N.C. App. 379, 389,

700 S.E.2d 412, 419 (2010) (citations and quotation marks omitted). Since “[e]vidence

which is probative of the State’s case necessarily will have a prejudicial effect upon

the defendant; the question is one of degree.” Coffey, 326 N.C. at 281, 389 S.E.2d at

56 (citation omitted).

 The trial court determined that the evidence should be admitted because the

probative value outweighed the potentially prejudicial effect. The trial court

expressly considered that the “evidence [was] not being offered to show that Mr.

Pabon acted in conformity with prior acts, [but] that [the] evidence [was] being offered

for a limited purpose” and gave the jury an instruction to that effect. Thus, the trial

 - 23 -
 STATE V. PABON

 Opinion of the Court

court did not abuse its discretion when it admitted the 404(b) evidence over

Defendant’s objection.

 Defendant further asserts that Samonds’ testimony was not sufficiently

credible to support a finding of Defendant’s prior bad acts because the Mecklenburg

County District Attorney’s Office did not pursue the earlier charge against

Defendant. However, this Court has previously stated that a “district attorney’s

dismissal . . . did not result in defendant’s being legally innocent of the prior assault

charge” and thus would not preclude evidence from being admissible under Rule

404(b). State v. Flaugher, 214 N.C. App. 370, 378, 713 S.E.2d 576, 584 (2011).

 For the reasons stated herein, the trial court did not err in when it admitted

the State’s 404(b) evidence.

III. Confrontation Clause

 Defendant alleges the trial court erred in admitting the testimony of Lewallen

in violation of the Confrontation Clause. Specifically, Defendant contends that

Lewallen failed to provide an independent opinion regarding the testing and analysis

of the victim’s blood and urine samples because both tests were performed by two

non-testifying forensic toxicologists. Defendant also argues he did not have a prior

opportunity to cross-examine the non-testifying experts, and that they were not

unavailable to testify.

 - 24 -
 STATE V. PABON

 Opinion of the Court

 “We review this alleged constitutional error de novo.” State v. Ortiz-Zape, 367

N.C. 1, 10, 743 S.E.2d 156, 162 (2013). “The Confrontation Clause of the Sixth

Amendment bars admission of testimonial evidence unless the declarant is

unavailable to testify and the accused has had a prior opportunity to cross-examine

the declarant.” State v. Locklear, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009)

(citations omitted).

 Our courts have consistently held that an expert
 witness may testify as to the testing or analysis conducted
 by another expert if: (i) that information is reasonably
 relied on by experts in the field in forming their opinions;
 and (ii) the testifying expert witness independently
 reviewed the information and reached his or her own
 conclusion in this case.

State v. Crumitie, ___ N.C. App ___, ___, 831 S.E.2d 592, 596 (2019) (citation omitted).

 In Ortiz-Zape, our Supreme Court stated:

 [W]hen an expert gives an opinion, the expert is the
 witness whom the defendant has the right to confront. In
 such cases, the Confrontation Clause is satisfied if the
 defendant has the opportunity to fully cross-examine the
 expert witness who testifies against him, allowing the
 factfinder to understand the basis for the expert’s opinion
 and to determine whether that opinion should be found
 credible. Accordingly, admission of an expert’s independent
 opinion based on otherwise inadmissible facts or data of a
 type reasonably relied upon by experts in the particular
 field does not violate the Confrontation Clause so long as
 the defendant has the opportunity to cross-examine the
 expert. We emphasize that the expert must present an
 independent opinion obtained through his or her own
 analysis and not merely surrogate testimony parroting
 otherwise inadmissible statements.

 - 25 -
 STATE V. PABON

 Opinion of the Court

Ortiz-Zape, 367 N.C. at 9, 743 S.E.2d at 161-62 (citations and quotation marks

omitted).

 During direct examination, Lewallen testified to the following:

 [LEWALLEN]. In our immunoassay or our drug screen
 platform we look for 12 routinely-encountered classes or
 specific drugs. We’re looking for Amphetamine and
 Methylenedioxyamphetamine. We’re looking for
 Benzodiazepines, which is a class of drugs, looking for
 opiates, which is also a class of drugs, cocaine metabolite,
 barbiturates, which is a class of drugs. We’re looking for
 Methadone specific drug, marijuana metabolites,
 Carisoprodol and Meprobamate, two specific drugs,
 Methamphetamine and Ectasy, Zolpidem, Tramadol and
 Oxycodone and Oxymorphone is our standard 12-panel test
 that we do.

 [THE STATE]. And what type of data is produced as a
 result of this preliminary screening test?

 [LEWALLEN]. Once the test is completed, then what
 happens is we get a print-off of the results of each
 individual case as to tell us whether or not there is an
 indication of one of those, having a positive indication one
 of those particular tests that I just laid out, or it will give a
 result of negative.

 [THE STATE]. Okay. And were you able to review that
 data that was printed off?

 [LEWALLEN]. Yes, ma’am, I was.

 [THE STATE]. And were you able to review that data
 and form your own opinion about what the result of that
 preliminary screen was?

 [LEWALLEN]. Yes, ma’am, I was.

 - 26 -
 STATE V. PABON

 Opinion of the Court

[THE STATE]. And, actually, have you performed this
test personally yourself?

[LEWALLEN]. Yes, ma’am, many times.

[THE STATE]. Okay. What opinion did you form about
that initial screening test?

[LEWALLEN]. For the blood it was negative for all 12
assays. For the urine we had a positive indication for
Amphetamine and Methylenedioxyamphetamine and for
Benzodiazepines.

[THE STATE]. Now, when you get a positive like the
positive you just described in the urine, what’s the next
step?

[LEWALLEN]. All cases will proceed for confirmatory
testing in which we will do a specific examination to
determine what particular drug is present in either the
blood or the urine.

[THE STATE]. So did you on this -- on this urine
sample from Samantha Forero, did you do the confirmatory
analysis test?

[LEWALLEN]. No, ma’am, I did not perform the
confirmatory testing on either the blood or the urine
sample.

[THE STATE]. Who did?

[LEWALLEN]. That would be Megan Dietz.

[THE STATE]. And what instrument did she use to
perform that test?

[LEWALLEN]. She used the GCMS that I referred to
earlier.

 - 27 -
 STATE V. PABON

 Opinion of the Court

[THE STATE]. Now, have you ever performed the
same test that she performed on that urine sample yourself
personally?

[LEWALLEN]. I have performed this test before, but I
have not tested that -- that sample.

[THE STATE]. Right. Not that sample, but just
performed that test on other samples?

[LEWALLEN]. Yes, ma’am, I’ve performed this test
many times.

[THE STATE]. Okay. You had testified earlier a
thousand times; is that fair or . . .

[LEWALLEN]. Yes, ma’am, I can’t even count how
many times I’ve performed analysis on the GCMS in my
career.

[THE STATE]. Now, are there safeguards to ensure
that that GCMS is working properly?

[LEWALLEN]. Yes, ma’am, there are. We have
safeguards built into every one of our procedures.

[THE STATE]. What are those safeguards?

[LEWALLEN]. For the GCMS, every day it must pass
a performance check in which we analyze a sample of
known anolytes. Those anolytes must provide acceptable
data. We get two pieces of data from a GCMS. We get a
time at which the anolyte comes off of the instrument, and
we also get its unique fragmentation pattern. Kind of like
– it’s kind of like a puzzle, you know. You put a puzzle back
together, it can only be put back together one way. That’s
exactly what we get. We get a chemical fingerprint of this
drug, and it is unique to that drug. And so what we do is
we compare that to known standards of that drug, and

 - 28 -
 STATE V. PABON

 Opinion of the Court

those have to be identical. And that’s one part of our
acceptability.

 Another part is an internal check that is built into
all GCMS’s that has to be performed prior to any analysis
that is performed. Also, as part of our extraction protocols
at the laboratory, we have quality control samples, both
positive and negative controls that are extracted in every
batch of cases. They are carried through our process
through the entirety of it. And when they go to the
instrument, those samples are both at the beginning and
the end of our analytical batches to show that the
instrument is operating property.

 In addition to that, prior to any sample being placed
on the instrument it must be done so in tandem, and that
loading of the instrument must be reviewed by another
person to verify that the instrument is loaded properly and
all samples were placed in their proper position. And this
is then documented and signed off on the -- on the
instrument sequence.

 Once this is done, all of this data is compiled and is
put together in a quality control packet, and that packet is
reviewed and made sure that all the data that is required
in our policies and procedures is present. And no data, no
case data from that run may be used until that QC packet
has been reviewed and approved for use.

[THE STATE]. Now, you were able to review the data
for this case from the sample from Samantha Forero are
(sic) right; is that correct?

[LEWALLEN]. Yes, ma’am, I was.

[THE STATE]. So to the best of your ability, was that
policy followed, all of those safety checks and controls and
all of that, was that properly followed?

[LEWALLEN]. Yes, ma’am, it was.

 - 29 -
 STATE V. PABON

 Opinion of the Court

 [THE STATE]. And was the data properly produced as
 a result of the confirmatory analysis as well as the
 preliminary screen?

 [LEWALLEN]. Yes, ma’am, it was.

 [THE STATE]. So was this test performed in
 accordance with the state crime lab operating procedures?

 [LEWALLEN]. Yes, ma’am, it was.

 [THE STATE]. And you were able to personally review
 all of the data that the test produced?

 [LEWALLEN]. Yes, ma’am, I was.

 [THE STATE]. Okay. Were you able to form an opinion
 about that test?

 [LEWALLEN]. Yes, ma’am, I was.

 [THE STATE]. What was the result of that test?

 [LEWALLEN]. For the blood, no substances were
 found present in the blood sample. In the urine sample, 7-
 aminoclonazepam was detected.

 [THE STATE]. And what is 7-aminoclonazepam?

 [LEWALLEN]. That is a biological metabolite or
 breakdown product of Clonazepam which is a
 Benzodiazepine.

(Defendant’s objections and the trial court’s rulings omitted).

 The record reflects that Lewallen personally reviewed machine generated data

from the preliminary immunoassay drug screen and the confirmatory results

produced by the GCMS. He offered his own opinion, without reference to or reliance

 - 30 -
 STATE V. PABON

 Opinion of the Court

upon the opinions or conclusions of the non-testifying technicians. See State v. Blue,

207 N.C. App. 267, 281, 699 S.E.2d 661, 670 (2010) (finding no violation of the

Confrontation Clause where the expert “was testifying as to his own observations and

providing information rationally based on his own perceptions . . . [and did not] testify

as to the declarations or findings of anyone other than himself.”). Thus, Lewallen’s

opinion was based on his own analysis and was not merely surrogate testimony for

an otherwise inadmissible lab report or signed affidavit certifying the non-testifying

technician’s results.

 Defendant further alleges that he “did not have a prior opportunity to cross-

examine the expert who performed the testing and prepared the report.” However,

“when an expert gives an opinion, the opinion is the substantive evidence and the

expert is the witness whom the defendant has the right to confront.” Ortiz-Zape, 367

N.C. at 12, 743 S.E.2d at 163. Here, Defendant had the opportunity to, and did,

question Lewallen extensively on cross-examination.

 Because Defendant’s Confrontation Clause rights were not violated, the trial

court did not err in admitting Lewallen’s expert testimony.

IV. Subject Matter Jurisdiction

 Defendant contends that the second-degree rape indictment is facially invalid

pursuant to N.C. Gen. Stat. § 15-144.1(c) because it failed to state the name of the

 - 31 -
 STATE V. PABON

 Opinion of the Court

victim. Second, Defendant argues the first-degree kidnapping indictment is invalid

because it failed to allege all essential elements of the crime. We disagree.

 “[W]e review the sufficiency of an indictment de novo.” State v. McKoy, 196

N.C. App. 650, 652, 675 S.E.2d 406, 409 (2009). “A valid bill of indictment is essential

to the jurisdiction of the Superior Court to try an accused for a felony and have the

jury determine his guilt or innocence, and to give authority to the court to render a

valid judgment.” State v. Marshall, 188 N.C. App. 744, 748, 656 S.E.2d 709, 712

(2008) (citations and quotation marks omitted).

 Defendant asserts that the use of the victim’s initials in the indictment was

insufficient. However, N.C. Gen. Stat. § 15-144.1(c) states:

 If the victim is a person who has a mental disability or who
 is mentally incapacitated or physically helpless, it is
 sufficient to allege that the defendant unlawfully, willfully,
 and feloniously did carnally know and abuse a person who
 had a mental disability or who was mentally incapacitated
 or physically helpless, naming the victim, and concluding
 as required by law. Any bill of indictment containing the
 averments and allegations named in this section is good
 and sufficient in law for the rape of a person who has a
 mental disability or who is mentally incapacitated or
 physically helpless and all lesser included offenses.

N.C. Gen. Stat. § 15-144.1(c) (2019).

 Defendant further argues that use of the victim’s initials is impermissible

pursuant to State v. White, 372 N.C. 248, 827 S.E.2d 80 (2019). In White, the North

Carolina Supreme Court held that using “Victim #1” in the indictment was

insufficient to “name the victim.” Id. at 252, 827 S.E.2d at 83. “[T]o name someone

 - 32 -
 STATE V. PABON

 Opinion of the Court

is to identify that person in a way that is unique to that individual and enables others

to distinguish between the named person and all other people. The phrase ‘Victim

#1’ does not distinguish this victim from other children or victims.” Id. at 252, 827

S.E.2d at 83.

 However,

 [w]here the statutes defining second-degree rape and
 second-degree sexual offense require the offenses to be
 against “another person,” the indictments charging these
 offenses do not need to state the victim’s full name, nor do
 they need to add periods after each letter in initials in order
 to accomplish the common sense understanding that
 initials represent a person.

McKoy, 196 N.C. App. at 654, 675 S.E.2d at 409-10. White is not applicable here. Use

of the victim’s initials sufficiently “identif[ies] [the victim] in a way that is unique to

that individual and enables others to distinguish between the named person and all

other people.” White, 372 N.C at 252, 827 S.E.2d at 82. There is nothing in White

which overturned “the common sense understanding that initials represent a person.”

McKoy, 196 N.C. App. at 654, 675 S.E.2d at 410. Consistent with McKoy, it is

unnecessary to include the victim’s full name. Therefore, the use of the victim’s

initials is proper.

 Defendant also argues that the first-degree kidnapping indictment is invalid

because it did not allege or specify what crime constituted the underlying “sexual

assault.” This argument is without merit. Although Defendant asserts that the

indictment must have alleged and specified the sexual assault element of first-degree

 - 33 -
 STATE V. PABON

 Opinion of the Court

kidnapping in order to be valid, our courts have never imposed such a requirement.

See State v. Freeman, 314 N.C. 432, 434-35, 333 S.E.2d 743, 745 (1985) (holding that

the indictment need not specify the underlying felony intended to be committed in

elevating the kidnapping charge to first-degree kidnapping to be valid); State v. Byers,

175 N.C. App. 280, 623 S.E.2d 357 (2006) (holding that a burglary indictment need

not identify the felony intended to be committed to be valid).

 “[T]he purposes of an indictment include giving a defendant notice of the

charge against him so that he may prepare his defense and be in a position to plead

prior jeopardy if he is again brought to trial for the same offense.” Freeman, 314 N.C.

at 435, 333 S.E.2d at 745.

 Because the indictments at issue here properly identified the victim and gave

Defendant notice of the charges against him, both indictments were valid. Therefore,

the trial court had jurisdiction over the matters.

V. Jury Instructions

 Defendant alleges the trial court committed plain error when it failed to

instruct the jury that the evidence presented to prove an element of the offenses could

not be used to also prove the aggravating factor. Specifically, Defendant contends

that the totality of the State’s evidence presented to demonstrate Defendant’s

violation of a position of trust, was identical to the evidence necessary to prove the

essential element of intent for both charges. Defendant argues that the trial court’s

 - 34 -
 STATE V. PABON

 Opinion of the Court

failure to properly instruct the jury had a probable impact on the jury finding the

aggravating factors. We disagree.

 “Failure to make an appropriate and timely motion or objection constitutes a

waiver of the right to assert the alleged error upon appeal[.]” N.C. Gen. Stat. § 15A-

1446(b) (2019). Our Courts have “elect[ed] to review such unpreserved issues for

plain error . . . when they involve . . . errors in the judge’s instructions to the jury[.]”

State v. Gregory, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (citations omitted).

 “To have an alleged error reviewed under the plain error standard, the

defendant must ‘specifically and distinctly’ contend that the alleged error constitutes

plain error.” State v. Lawrence, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012)

(citations omitted). Here, Defendant concedes that he did not object to the jury

instruction at trial, and argues the trial court committed plain error when it failed to

properly instruct the jury.

 In order to establish plain error, a defendant bears the burden of

demonstrating that a fundamental error occurred at trial. Id. at 518, 723 S.E.2d at

334. For an error to be fundamental, “a defendant must establish prejudice—that,

after examination of the entire record, the error had a probable impact on the jury’s

finding that the defendant was guilty.” Id. at 518, 723 S.E.2d at 334 (citation and

quotation marks omitted).

 At trial, the court provided the following jury instruction:

 - 35 -
 STATE V. PABON

 Opinion of the Court

 Do you find from the evidence beyond a reasonable doubt
 the existence of the following aggravating factor: The
 defendant took advantage of a position of trust or
 confidence to commit the offense? . . . . You should consider
 all the evidence, the arguments, contentions and positions
 urged by the attorneys and any other contention that arises
 from the evidence.

 The trial court’s instruction indicated the jury “should consider all the

evidence.” However, pursuant to N.C. Gen. Stat. § 15A-1340.16(d), “[e]vidence

necessary to prove an element of the offense shall not be used to prove any factor in

aggravation, and the same item of evidence shall not be used to prove more than one

factor in aggravation.” N.C. Gen. Stat. § 15A-1340.16(d) (2019). “Because N.C. Gen.

Stat. § 15A-1340.16(d) limits what evidence the jury can consider in deciding whether

an aggravating factor exists, the trial court was required to instruct the jury in

accordance with the statute—as the pattern jury instruction specifies.” State v.

Barrow, 216 N.C. App. 436, 446, 718 S.E.2d 673, 679 (2011). Here, the trial court

erroneously failed to provide a limiting instruction as to the aggravating factor

because the trial court instructed the jury that it could consider all of the evidence

when deliberating and deciding the aggravating factor.

 While the trial court’s instruction was in error, Defendant must demonstrate

“a reasonable possibility that had the instruction been given, the jury would have

failed to find the existence of the aggravating factors.” Id. at 446, 718 S.E.2d at 679.

See N.C. Gen. Stat. § 15A-1443(a) (2019).

 - 36 -
 STATE V. PABON

 Opinion of the Court

 The jury shall not use “[e]vidence necessary to prove an element of the offense

. . . to prove any factor in aggravation.” N.C. Gen. Stat. § 15A-1340.16(d). Defendant

alleges that the State’s evidence tending to show a violation of a position of trust was

identical to the evidence necessary to prove intent to commit second-degree forcible

rape and first-degree kidnapping. However, violation of a position of trust is not an

element of either first-degree kidnapping or second-degree forcible rape. Accordingly,

evidence used to prove the aggravating factor was not necessary to prove that

Defendant intended to commit second-degree forcible rape or first-degree kidnapping.

Therefore, Defendant did not demonstrate that there was a reasonable possibility

that the instructional error had an impact on the jury’s verdict. Thus, Defendant was

not prejudiced by the jury instruction.

VI. SBM

 Defendant’s last argument on appeal is that the trial court erred when it

overruled his objection to imposition of SBM for life. However, other than listing this

argument in the index, Defendant does not argue this issue in the body of his brief.

 “Issues not presented in a party’s brief, or in support of which no reason or

argument is stated, will be taken as abandoned.” N.C. R. App. P. 28(b)(6).

Furthermore, “[i]t is not the duty of this Court to supplement an appellant’s brief

with legal authority or arguments not contained therein.” Goodson v. P.H. Glatfelter

 - 37 -
 STATE V. PABON

 Opinion of the Court

Co., 171 N.C. App. 596, 606, 615 S.E.2d 350, 358 (2005); N.C. R. App. P. 28.

Defendant has abandoned this argument.

 Conclusion

 For the foregoing reasons, we find that Defendant received a fair trial free of

prejudicial error.

 NO PREJUDICIAL ERROR.

 Judge BRYANT concurs.

 Judge MURPHY dissents in separate opinion.

 - 38 -
 No. COA19-741 – State v. Pabon

 MURPHY, Judge, dissenting in part and concurring in part.

 Defendant argues the trial court erred in overruling Defendant’s Confrontation

Clause objections to the testimony of Frank Lewallen, a regional forensic scientist

manager for the State Crime Lab, regarding the tests performed by a non-testifying

chemical analyst. Defendant states it is

 undisputed that Lewallen . . . did not perform the testing
 or analysis that produced this result, that the expert who
 performed the testing and prepared the report was not
 unavailable to testify, and that Defendant did not have a
 prior opportunity to cross-examine the expert who
 performed the testing and prepared the report.

Defendant contends on appeal Lewallen failed to provide an independent opinion

regarding the testing and analysis of the victim’s blood and urine samples because

both tests were performed by two non-testifying forensic toxicologists. I cannot join

the Majority in holding “Lewallen’s opinion was based on his own analysis and was

not merely surrogate testimony for an otherwise inadmissible lab report or signed

affidavit certifying the non-testifying technician’s results.” Supra at 31. Therefore,

I respectfully dissent in part.

 Rule 702(a) provides that an expert witness may testify “in the form of an

opinion” if “scientific, technical or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue.” N.C.G.S. § 8C-1, Rule

702(a) (2019) (emphasis added). “[T]he expert must present an independent opinion

obtained through his or her own analysis and not merely ‘surrogate testimony’
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

parroting otherwise inadmissible statements.” State v. Ortiz-Zape, 367 N.C. 1, 9, 743

S.E.2d 156, 162 (2013).

 In Bullcoming v. New Mexico, the United States Supreme Court decided

“whether the Confrontation Clause permits the prosecution to introduce a forensic

laboratory report containing a testimonial certification—made for the purpose of

proving a particular fact—through the in-court testimony of a scientist who did not

sign the certification or perform or observe the test reported in the certification.”

Bullcoming v. New Mexico, 564 U.S. 647, 652, 180 L. Ed. 2d 610, 616 (2011). The

Court held “surrogate testimony of that order does not meet the constitutional

requirement. The accused’s right is to be confronted with the analyst who made the

certification, unless that analyst is unavailable at trial, and the accused had an

opportunity, pretrial, to cross-examine that particular scientist.” Id.

 Our Supreme Court followed the Bullcoming holding in State v. Craven,

ordering a new trial where a lab report was improperly admitted into evidence after

a State Bureau of Investigation analyst testified about the content of lab reports

that the analyst did not create. State v. Craven, 367 N.C. 51, 744 S.E.2d 458 (2013).

The prosecutor asked:

 Q. Now did you also bring with you notes and
 documentation for the date of offense March 3, 2008?

 A. I did.

 Q. And who—who completed that analysis?

 2
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

A. Mr. Tom Shoopman completed that analysis.

….

Q. And did you bring his report?

A. I did.

Q. Did you have a chance to review it?

A. I have.

Q. Do you agree with its conclusions?

A. I do.

….

Q. What was Mr. Shoopman’s conclusion?

[Objection by defense counsel]

….

A. According to the lab report prepared by Tom Shoopman,
the results for State’s Exhibit Number . . . . 10 were cocaine
base schedule two controlled substance with a weight of 1.4
grams.

The lab report then was admitted into evidence.

Similarly, regarding the 6 March 2008 sample, the State
asked:

Q. Now turning to State’s Exhibit Number 12 and offense
date March 6th of 2008, did you bring a report from the SBI
regarding that date of offense?

A. I did.

 3
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

 Q. Who conducted that analysis?

 A. Mr. Irvin Allcox.

 Q. And do you have that report in your hand?

 A. I do.

 Q. And do you have the underlying data supporting that
 conclusion?

 A. I do.

 Q. And you do agree with the conclusion stated in that
 report?

 A. I do.

 ….

 Q. And what conclusion did [Mr. Allcox] reach?

 [Objection by defense counsel]

 A. The item . . . . twelve was cocaine base, schedule two
 controlled substance. And it had a weight of 2.5 grams.

Id. at 55-56, 744 S.E.2d at 461 (emphasis omitted). The testimony was not an

independent opinion obtained through the analyst’s own analysis. Our Supreme

Court in Craven held the analyst “did not offer—or even purport to offer—her own

independent analysis or opinion on the . . . samples. Instead, [she] merely parroted

[the testing agent’s] conclusions from their lab reports.” Id. at 56-57, 744 S.E.2d at

461.

 4
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

 Further, in Ortiz-Zape, related testimony was offered by a testifying analyst,

but “the reports produced by the non-testifying analyst were not admitted into

evidence.” Ortiz-Zape, 367 N.C. at 11, 743 S.E.2d at 163. In Ortiz-Zape, however,

“the prosecutor established that [the testifying analyst’s] opinion was her own,

independently reasoned opinion—not ‘surrogate testimony’ parroting the testing

analyst’s opinion.” Id. at 12, 743 S.E.2d at 163. The prosecutor in Ortiz-Zape asked:

 Q. Based on your training and experience in the field of
 forensic chemistry and your employment at the CMPD
 crime lab as well as other labs prior to that and your review
 of the file in this case, did you have a chance to form your
 own independent expert opinion as to the identity of the
 substance in control number 16826?

 A. Yes, I did.

 Q. What is your independent expert opinion?

 [DEFENSE COUNSEL]: Objection, your Honor. I don’t
 need to be heard further.

 THE COURT: Yes, ma’am. Objection overruled, you may
 answer.

 A. My conclusion was that the substance was cocaine.

 Q. Is that still your opinion currently?

 A. Yes, it is.

Id. at 11, 743 S.E.2d at 163. The defendant argued this expert opinion was

inadmissible because the expert “did not personally test or observe [the substance]

being tested [which] violated his right to confront witnesses against him.” Id. at 12,

 5
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

743 S.E.2d at 163. Our Supreme Court held the expert gave her opinion that was

“based upon facts or data of a type reasonably relied upon by experts in the particular

field in forming opinions or inferences upon the subject.” Id. (internal quotations

omitted). Our Supreme Court further concluded “[t]his expert opinion, from [the

testifying analyst’s] own analysis of the data, constituted the substantive evidence

being presented against [the] defendant[,] . . . [and the d]efendant was able to cross-

examine” the testifying analyst. Id. at 13, 743 S.E.2d at 164 (internal citations

omitted).

 The proffered testimony from Craven is almost identical in nature to the

testimony here. Lewallen’s testimony is not substantially similar to that of Ortiz-

Zape and is more similar to the testimony in Craven that was not admissible.

Lewallen simply parroted the conclusions of a test performed by another person not

subject to the confrontation required by the United States Constitution.

 The State only asked Lewallen “[w]ere you able to form an opinion about that

test?” Lewallen did not actually offer an opinion as to what the substance was. The

State followed up that question with, “[w]hat was the result of that test?” To that

question, Lewallen parroted the results of the test he did not perform, and stated

“[f]or the blood, no substances were found present in the blood sample. In the urine

sample, 7-aminoclonazepam was detected.” Lewallen’s testimony was not his

independent opinion satisfying Rule 702 safeguards. Our Supreme Court found

 6
 STATE V. PABON

 Murphy, J., dissenting in part and concurring in part.

similar statements to be inadmissible in Craven when the prosecutor asked the

expert about the “conclusion” of the test results, to which the expert responded

“[a]ccording to the lab report prepared by [the other expert], the results for State’s

Exhibit Number . . . . 10 were cocaine base schedule two controlled substance with a

weight of 1.4 grams.” Craven, 367 N.C. at 56, 744 S.E.2d at 461.

 Unlike in Ortiz-Zape, where the expert gave an “independent expert opinion,”

Ortiz-Zape, 367 N.C. at 11, 743 S.E.2d at 163, Lewallen provided surrogate testimony

on an otherwise inadmissible lab report. Lewallen did not provide testimony in the

form of an opinion and did not present an independent opinion through his own

analysis. “Dispensing with confrontation because testimony is obviously reliable is

akin to dispensing with jury trial because a defendant is obviously guilty. This is not

what the Sixth Amendment prescribes.” Crawford v. Washington, 541 U.S. 36, 62,

158 L. Ed. 2d 177 (2004). Lewallen’s testimony was inadmissible and Defendant is

entitled to a new trial free from this prejudicial violation of his constitutional rights.

I respectfully dissent in part.

 I concur in the Majority as to Parts I, II, and IV, but would hold Parts V and

VI to be moot in light of my dissenting opinion as to Part III.

 7